Howry, J.,
delivered the opinion of the court:
Plaintiff, as administratrix of the estate of the late Judge James, brings this action to recover the difference between the salary paid to. him after his retirement as an associate justice of the Supreme Court of the District of Columbia and the salary which she claims should have been paid from the beginning of the judge’s retirement to the period of his death. The claim is sought to be founded upon section 714 of the Revised Statutes, which provides as follows:
“When any judge of any court of the United States resigns his office, after having held his commission as such at least ten years and having attained the age of 70 years, he shall, during the residue of his natural life, receive the salaiy which by law was payable to him at the time of his resignation.”
Judge James resigned December 1, 1892, having held his commission more than ten years, and being then in the seventjT-fourth jmar of his age. He died August 1, 1899. During his retirement he was paid at the rate of $4,000 per annum, besides a small sum hereinafter mentioned, while it is claimed he should have been paid at the rate of $5,000 per annum.
It is contended that the Supreme Court of the District of Columbia is not one of the inferior courts established under *626 that part of Section I of Article III of the Constitution, which declares that
“The judicial power of the United States shall be vested in one Supreme Court and in such inferior courts, as the Congress may from time to time ordain and establish. The judges, both of the Supremo and inferior courts, shall hold their offices during good behaviour and shall at stated times receive for their services a compensation, which shall not be diminished during their continuance in office.”
By Section II this judicial power is extended to all cases In law and equity therein enumerated.
The contention ignores the constitutional guaranty of judicial independence arising from tenure of office and permanence in' salary, and assumes that the Supreme Court of the District of Columbia is merely a legislative creation which Congress may abolish or change at will, without regard to incumbents, as in courts created for the Territories under a different article of the Constitution, from which it would result, if the contention be sound, that the Supreme Court of the District of Columbia is not a court of the United States within the meaning of section 111 of the Revised Statutes.
In Embry v. Palmer (107 U. S., 3) the Supreme Court of the United State's designated the Supreme Court of the District of Columbia as a court of the United States. This would end the discussion did it clearly appear from the decision that the court meant to declare a difference between Territorial courts and courts provided for the seat of government. In delivering the opinion, Mr. Justice Matthews said: “That the Supreme Court of the District of Columbia is a court of the United States results from the right of exclusive legislation over the District which the Constitution has given to Congress.”
It is argued, however, that the designation meant a court of the United States in the same sense that a court established by Congress in a Territory with circuit or district court jurisdiction meant. And that whether such courts be established in a Territory or in the District of Columbia, neither can exercise any of the judicial powers enumerated in Section IU of Article III of the Constitution, but that they can only exercise like powers.
*627 Territorial courts are established under the general authority of Congress or by virtue of Section III of Article IV of the Constitution, which declares that “The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.'’
Defining the status of the two superior courts created by the act of March 30, 1822, for the establishment of a Territorial government in Florida, Chief Justice Marshall said they were not constitutional courts, but “legislative courts created in virtue of the general right of sovereignty which exists in the Government, or in virtue of that clause which enables Congress to make all needful rules and regulations respecting the territory belonging to the United States." (American Ins. Co. v. Canter, 1 Pet., 511, 546.) jjBut all the provisions of- the Constitution must be considered and construed together in determining whether in the organization and control of Territorial governments all acts, including those establishing judicial tribunals, were not designed for purposes of temporary government while other acts, under 'which permanent courts were expected or required to be provided, included the right to make these permanent judicial bodies the depositary of some part of the judicial powers conferred by the Constitution on the General Government.!
Under section 8 of Article I of the Constitution, Congress have the power “ to exercise exclusive legislation in all cast's whatsoever over such district (not exceeding 10 miles square) as may, by cession of particular States and the acceptance of Congress, become the seat of the Government of the United States.”
The 10 miles square that might by cession of particular .States and the acceptance of Congress become the seat of government was meant by the framers of the Constitution to be as permanent as the States from whose boundaries the square was to be taken. The seat of government, unlike the territory acquired by conquest, treaty, and cession, was not to be donated or accepted as a transitory territorial boundary. It was a part of the constitutional scheme to provide for the perpetual use of enough territory free from State control to *628 meet the demands of a permanent national seat of government. It would seem anomalous if the courts to be provided for the seat of government were not intended to be courts of the United States capable of receiving the judicial power provided by Article III as far as this judicial power could he made to apply and extend.
The legislation of Congress from the beginning of the Government to the present time is largely in keeping with the view that Congress have legislated upon the theory that the courts of the District of Columbia are permanent tribunals capable of receiving some part of the -judicial power which can bo conferred on courts in the District of Columbia as well as on courts of the United States in the States.
The judiciary act of 1T89 included the area which later formed the District of Columbia. (1 Stat. L., 73.)
When by the act of February 13,1801 (2 Stat. L., 89), Congress passed an act to provide for the more convenient, organization of the courts of the United States, the District of Columbia ivas included within a Federal district created by the act. .By the act of February 27,1801 (2 Stat. U., 103). entitled “An act concerning the District of Columbia,” the laws then in force in the State of Virginia and in the State of Maryland were continued in force in that part of the District which had been ceded by those States. A separate Circuit Court for the district wras made, in effect with all the powers of circuit courts and with judges of the same kind of tenure as provided for the court of the circuit from which the District was omitted. The District of Columbia was thus to all intents and purposes segregated as a single circuit from the other circuits and stood alone as a Circuit Court, m¿ geuevix. It possessed most of the powers belonging to circuit and district courts of the United States and nearly all the jurisdiction that belonged to either of them, and also had some powers which belonged to neither of those courts.
The District of Columbia is within the meaning of the. uniformity clause of the Constitution under the decision in the well-known case of Loughborough v. Blake (5 Wheat., 317). The District is a part of the United States for all purposes, domestic and international. It must continue so. Certain *629 provisions of the Constitution which apply only to the States as such, or to the citizens of the States as such, may not be operative in the District, or to the citizens of the District, because the subjects to which they relate, or the conditions to which they apply, do not exist. Thus, citizens of the District of Columbia do not possess certain political rights that citizens of the States respectively have and enjoy. The constitutional right to bring a suit in a United States court against a citizen residing in any State of the Union is denied to a citizen here, because the District of Columbia is not a State within the meaning of that term as used in the Constitution. (Hepburn v. Ellzey, 2 Cranch, 445.) But the courts here have judicial power as permanent and lasting as elsewhere, and possess those subjects of jurisdiction which constitutionally are given to them. To bo inferior courts under Article III the}7 need not possess all the powers and subjects of jurisdiction precisely like every other court of the United States. The requisite jurisdiction is rightfulty conferred if within the subjects of the jurisdiction so conferred classes of matter fall which the courts so created may rightfully entertain.
The complete and exlusive jurisdiction of Congress over the District is incompatible with the proposition that the District was intended to be organized for judicial purposes as foreign territory which Congress might dispose of, or as territory to be held so tentatively that the judicial power could not be lodged in tribunals as national in character as courts provided in those States which had ceded the District for national purposes forever. Territory acquired for the seat of government continues to be national. The rights of persons to their lives, liberty, and property are the same in the District as in the States, and the judicial powers of the supreme court created for the District are the same and are to be exercised at law and equity in the same manner for the protection of life and property as in the United States courts created for the States, as near as as may be.
But because the Supreme Court of the District of Columbia is vested with some powers not enumerated in Article III of the Constitution it is argued that it can not be a constitutional court like those provided for by section 714 of the Revised Statutes.
*630 ' The proposition disregards the permanency intended by mo organic law for any' and all courts thereafter to be established at the seat of government. It ignores the design of the framers of the fundamental law to create a court of the United States at the capital where the judicial power provided by Article III should be lodged most appropriately and as far as practicable during the existence of the Government. Courts established for sections of the country pending the admission of such country as States imply the exercise of temporary functions which differentiate such tribunals from those whose powers imply continuity and permanence.
The proposition further ignores the right of Congress in the creation of courts under Article III to confer some of the judicial powers therein enumerated on certain of the inferior tribunals authorized to be established and other of the powers enumerated on certain other inferior tribunals authorized to be created by the same article. This court,for example, ‘"is constituted one of those inferior courts which Congress authorizes” under Article III (United States v. Klein, 13 Wall., 145); but the jurisdiction it has of contracts between the Government and the citizen from which appeals may be taken directly to the Supreme Court is a larger jurisdiction than that conferred by the act of March 3, 1887 (24 Stat. L., 505), on other courts of the United States, as by that act the district and circuit courts of the United States are given concurrent jurisdiction with this court, to a limited extent only, of suits against the United States.
Various acts not necessary to notice were superseded by the judiciary reorganization act of March 3,18G3 (12 Stat. L., 762), by which enactment the present Supremo Court of the District of Columbia was established. The judges thereof (of whom there were four), one of whom was denominated “ chief justice,” were to be appointed by the President, by and with the advice and consent of the Senate, and were to hold their offices “ during good behavior.” That is the phraseology of Section I of Article III. Their salaries were fixed, and subsequent statutes increased the number of judges and the amount of their compensation. Congressional, departmental, and executive construction since that time — a period of forty years — continued to fix the Supreme Court of the District of *631 Columbia as a tribunal established under Article III and protected its judges by the Constitution. The rule that the contemporaneous construction of a statute by those charged with its execution should not be disregarded except for cogent reasons, and unless it be clear that such construction is erroneous, applies with even greater force in the construction of a provision of the Constitution so long and continuously acted upon by the two coordinate departments of the Government as the legislative and executive. The acquiescence of Congress and the Executive for a long time, by which the rights of parties have been determined and adjudged for many years, do not make constitutional that which is unconstitutional; but, to say the least, the ambiguity and doubt are too great for us to say that the interpretation which recognizes the Supreme Court of the District of Columbia as one of the inferior courts created by Article III of the Constitution is erroneous.
The District of Columbia had been subject to the Constitution while it was a part of the territory of those States which ceded it to the Federal Government. The Constitution attached to it in the beginning and continued to attach to the District after the cession. The terms of the Constitution were over the District irrevocably. The cession of the District relinquished the authority of the States, but did not take it out of the United States. “Neither party had ever consented to that construction of the cession. If, before the District was set off, Congress had passed an unconstitutional act affecting its inhabitants it would have been void. If done after the District was created, it would have been equally void.” (Downes v. Bidwell, 182 U. S. R., 244, 261.)
•We can not believe that the relinquishment by the States to the United States of the 10 miles square for a permanent seat of government deprived Congress of the constitutional right to continue in the District some judicial tribunal which should have and exercise some part of the judicial power conferred by Article III.
W e are not unmindful that the constitutional question considered is perhaps not necessarily involved in the determination of the issues presented, and that like all other courts we might well ignore the determination of anything which seems to be merely academic. But the parties have presented the *632 case upon the theory that the proposition considered is in issue and have invited its determination; and as the question of constitutional construction underlies the' whole case, we have viewed the proposition as not entirely in the abstract. Thus, we take the record as presented, inasmuch as without reference to our view of the matter the Supreme Court will deal with the issues on a-jSpeal in its own wajn
The recovery of the amount of salary claimed presents a more serious question, notwithstanding the views announced respecting the character and tenure of the judges affected. The temporaiy character of the legislation from year to year in providing varying compensation and reserving or implying on the face of the annual appropriations for the payment of salaries the right to change the amount for another and subsequent fiscal year, and the failure in the one piece of permanent legislation to provide a higher salary beyond the year than that payable to the retired judge at the time of his resignation, creates the real difficulty.
The act of June 1,186(5 (11 Stat. L., 14), fixed the compensation of the chief justice at $4,500 per annum and of the associate judges at $4,000 each from and after the passage of the act. Thereafter appropriations were made-in the legislative, executive, and judicial appropriation acts for salaries as fixed by the act of 1866 for each fiscal year up to and including the fiscal year ending June 30, 1891. These appropriations provided for another associate justice, created by the act of June 21, 1870 (16 Stat. L., 160), and yet another associate justice authorized to be appointed by the act of February 25, 1879 (20 Stat., 320).
The appropriation act for the fiscal year ending June 30, 1892 (26 Stat. L., 908, 947), contains the following provision: “For salary of the chief justice of the supreme court of the District of Columbia and the five associate justices, at the rate of five thousand dollars per annum each, thirty thousand dollars.” The enacting clause of this act provided that the various sums appropriated were “ in full compensation for the sendee” of that fiscal year; and section 4 of the same act provided “ that all acts or parts of acts inconsistent or in conflict with the provisions of this act are hereby repealed.” (Ib., 948.)
*633 The appropriation act for the fiscal 3’ear ending June 30, 1893 (27 Stat. L.,183, 223), provided “for salaries of the chief justice of the Supreme Court of the District of Columbia and the five associate judges, twentjT-four thousand five hundred dollars.” The enacting clause of this statute provided that the sum so appropriated was ‘' in full compensation for the service ” of the fiscal year; and the last section of the act provided “ that all acts or parts of acts inconsistent or in conflict with the provisions of th is act are hereby repealed. ” (lb., 223.) The sum so appropriated was the amount which had been fixed by law for the salaries of these six judges until the enactment of the appropriation act for the fiscal year ending June 30,-
1892. Thus, during the fiscal year ending June 30, 1892, plaintiff’s intestate was paid a salary at the rate of $5,000 a year, as provided by the appropriation act for that fiscal year. For the next succeeding fiscal year, ending June 30, 1893, he. was paid a salary at the rate of $4,000 a year, as provided by the appropriation act for that year; and as he resigned from the bench on December 1 of the same fiscal year he was paid a salary at that rate until the time of his decease, pursuant to the provisions of section 714 of the Revised Statutes.
Under an act entitled “An act to establish a court of appeals for the District of Columbia,” approved February 9, 1893, the salaries of the justices of the Supreme Court of the District of Columbia were increased to $5,000 each, pajmble quarterly if necessaiy. (27 Stat. L., 136.)
No provision for an increased amount of salary for judges who had retired was made by the act of February 9, 1893.
The legislative, executive, and judicial act for the fiscal year ending-June 30,1894(27 Stat. D., 675, 714), appropriated “for salaries of the chief justice of the Supreme Court of the District of Columbia and the five associate judges, thirty thousand five hundred dollars. One-half of the foregoing amounts * * * shall be paid from the revenues of the District of Columbia.” The enacting clause of this act likewise provided that this appropriation was made ‘ ‘ in full compensation ” for the service of the fiscal year, and the last section repealed all acts or parts of acts inconsistent or in conflict with any of its provisions.
The appropriation act for the fiscal year ending June 30, 1895 (28 Stat. L., 162, 204), also contained the like enacting *634 clause and repealing section, and appropriated as provided in the act of June 30,1894. Thereafter like appropriations were made annually in the same terms and amounts with like enacting clauses and repealing sections. The deficiency appropriation act of March 2, 1895 (28 Stat. L., 843, 851), contained a provision “to pay the chief justice and five associate justices of the Supreme Court of the District of Columbia the difference between the rate of compensation received by them and five thousand dollars per annum for the fiscal year eighteen hundred and ninety-three, four thousand one hundred and fifty-five dollars and forty-seven cents, or as much thereof as may be necessary.” Pursuant to this appropriation, plaintiff’s intestate was paid in April, 1895, the sum of $415.80 for that part of the fiscal year 1893 during which he held the commission of associate justice of the Supreme Court of the District of Columbia, and out of the remainder of the appropriation the chief justice and the other associate justices who held commissions during the whole of the year were paid sums which, when added to the salaries appropriated for them in the regular appropriation act for the year, amounted to $5,000 for the chief justice and $5,000 for each associate justice who was in office when claimant’s decedent resigned, and a proportionate amount was paid to his successor in office.
. The appropriations for the fiscal year ending June 30,1893— the year of Judge James’s retirement — did not fix a definite salary beyond that year. The annual sums appropriated were couched in language indicating that Congress meant to keep control of the amount of salaries for judges of the Supreme Court of the District of Columbia from year to year. The phraseology employed to accomplish this end may or may not have been intended to avoid the constitutional objection to the diminution of salary after being permanently increased. But there was no such permanent increase of salary during the incumbency of the deceased judge as to entitle him to claim the compensation throughout his retirement given bjr the appropriation act for the fiscal year ending June 30,1892. The fourteenth section of the act of February 9, 1893 (27 Stat. L., 436, ante), did not increase the salary which by law was payable at the time of the resignation, from which it follows that plaintiff is not entitled to recover. Accordingly, the petition must be dismissed.